## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| DIRECT RESPONSE MEDIA, INC. | : | Case No. 10-10058 (KG) |
| a/k/a ON TARGET MEDIA, INC. | : | |
| | : | |
| Debtor. | : | |
| _____ | : | |
| JEOFFREY L. BURTCH, | : | |
| CHAPTER 7 TRUSTEE, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. 10-50855 (KG) |
| | : | |
| SEAPORT CAPITAL, LLC, SEAPORT | : | |
| CAPITAL PARTNERS III L.P., SEAPORT | : | |
| CAPITAL PARTNERS III/A, L.P., | : | |
| SEAPORT CO-INVEST III, L.P., SEAPORT | : | |
| ASSOCIATES III, LLC, SEAPORT | : | |
| INVESTMENT PARTNERS III, L.P., ON | : | |
| TARGET MEDIA HOLDINGS, INC., | : | |
| JAMES J. COLLIS, ROBERT R. | : | |
| TAMASHUNAS, ANDREW MEYERS, | : | |
| MARIA B. EDEN, INNOVATION ADS, | : | |
| INC., MICHAEL LASTORIA, MICHAEL | : | |
| SICKENIUS a/k/a IAIN GRAE, RICHARD | : | |
| STEWART, and CAPITALSOURCE | : | |
| FINANCE LLC, | : | |
| | : | **Re D.I. Nos. 22, 43, 45, 76, 77, 78,** |
| Defendants. | : | **79, 80 & 173** |
| _____ | **:** | |

## <u>OPINION</u>[1]

---

[1]   "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ."  Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Defendants CapitalSource Finance, LLC ("CapSource"), Seaport Capital, LLC and its affiliated defendants (collectively, "Seaport"), James Collis, Robert Tamashunas, Andrew Meyers, On Target Media Holdings, Inc. ("OTMH"), Innovation Ads, Inc. ("Innovation"), Michael Lastoria, Iain Grae *a/k/a* Michael Sickenius, Maria B. Eden, and Richard Stewart have brought motions to dismiss (the "Motions to Dismiss") (D.I. 43, 45 77, 78, 79, 80, ) the Chapter 7 Trustee's Amended Complaint (D.I. 22). The Chapter 7 Trustee (the "Trustee") has included in the Amended Complaint claims for Avoidance and Recovery of Fraudulent Transfers under 11 U.S.C. § 548 and 544, Avoidance of Preferential Transfers under 11 U.S.C. § 547, Recovery of Fraudulent and Preferential Transfers under 11 U.S.C. § 550 and 551, Turnover of Assets of the Estate under 11 U.S.C. § 542, Accounting, Aiding and Abetting, and Unjust Enrichment/Imposition of a Constructive Trust or Equitable Lien. For the reasons discussed below the Court will deny, in part, and grant, in part, the Defendants' Motions to Dismiss.

## I. JURISDICTION

The Court has jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. § 1409. Although jurisdiction is proper and this is a core proceeding, as a result of *Stern v. Marshall*, __U.S.___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) (hereinafter "*Stern*"), this Court's authority to enter final orders is at issue and is discussed *infra*.

## II. <u>FACTS</u>

Direct Response Media, Inc. ("Pennsylvania Direct Response") was incorporated as a Pennsylvania corporation in 1990 by Maria Eden and Cary Scottoline. Amended Complaint (D.I. 22) "Am. Compl." ¶ 36. OTMH and its wholly-owned subsidiary On Target Media, Inc. (which later became Direct Response Media, Inc., ("Direct Response" or "Debtor")) were incorporated in Delaware. Am. Compl. ¶ 37-38. Additionally, Defendant Seaport Capital, LLC ("Seaport")[2] held 83% of the OTMH stock. Am. Compl. ¶ 51. Seaport's directors, Defendants James Collis, Robert Tamashunas, and Andrew Meyers, were majority members on the OTMH board of directors and later controlled the Innovation Ads, Inc. ("Innovation") board of directors. Am. Compl. ¶ 56-57. Maria Eden served as President of Direct Response and as a director of both OTMH and Direct Response. Am. Compl. ¶¶ 56, 59.

On February 26, 2006, Seaport, through OTMH, acquired Pennsylvania Direct Response for a purchase price of $11 million. Am. Compl. ¶ 41. As a result of the sale, On Target Media Inc., the successor company to Pennsylvania Direct Response, was reincorporated in Delaware as Direct Response Media Inc. To finance the acquisition of Pennsylvania Direct Response, OTMH obtained a $7.5 million loan from CapitalSource Finance, LLC ("CapSource"). Am. Compl. ¶ 61-67. The $7.5 million loan was co-guaranteed and secured by the newly acquired Direct Response's assets. Am. Compl. ¶

---

[2] The Seaport Defendants, Seaport Capital, LLC; Seaport Capital Partners III, L.P.; Seaport Capital Partners III/A, L.P.; Seaport Co-Invest III, L.P.; Seaport Associates III, LLC; and Seaport Investment Partners III, L.P. hereinafter shall be referred to as ("Seaport").

62-63.

Later, on September 29, 2006, Seaport, through OTMH, purchased Innovation from owners Iain Grae *a/k/a* Michael Sickenius ("Grae/Sickenius") and Michael Lastoria[3] ("Lastoria") for $36.5 million (the "Innovation Transaction"). Am. Compl. ¶ 74. The Innovation Transaction was composed of $18.4 million in cash, $9 million in promissory notes, and 55,000 shares of OTMH. Am. Compl. ¶ 79-82. As a result of the Innovation Transaction, the Debtor and Innovation became wholly-owned subsidiaries of OTMH. Am. Compl. ¶ 83-89. To complete the Innovation Transaction, the Debtor became a co-borrower and co-guarantor, jointly and severally liable with Innovation for an additional $19 million from CapSource (the "Amended CapSource Loan"). Am. Compl. ¶ 94. OTMH also served as a guarantor on the Amended CapSource Loan. Am. Compl. ¶ 96. After both transactions, the total secured debt of CapSource was $26.5 million. Am. Compl. ¶ 95.

A portion of the proceeds from the Amended CapSource Loan was used to pay the Innovation sellers Lastoria and Grae/Sickenius. Am. Compl. ¶ 105. The Trustee alleges Lastoria received $8,279,781.17 and Grae/Sickenius received $10,119,732.54. Am. Compl. ¶ 105. Pursuant to the terms of the Innovation Transaction, Lastoria became Chief Executive Officer and Secretary of the acquired Innovation and was appointed to the Board of Directors of OTMH effective September 29, 2006. Am. Compl. ¶ 88. Similarly, Grae/Sickenius was appointed Chairman of the Board of Directors and President of the

---

[3] Defendants Collis, Tamashunas, Meyers, Eden, Grae/Sickenius, Lastoria and Stewart will be referred to collectively as the "Board Defendants".

acquired Innovation, effective September 29, 2006. Am. Compl. ¶¶ 33(d), 113.

In November 2007, OTMH, through Innovation invested $2.5 million in Big Picture Media Inc. ("Big Picture") for 1,592,357 shares of Series B Convertible Preferred Stock which represented a 31.7% ownership interest of Big Picture on a fully diluted basis. Am. Compl. ¶ 124-25. The Trustee alleges that at this juncture Innovation was experiencing financial difficulties, but nonetheless Seaport, OTMH, Grae/Sickenius, Lastoria, and CapSource made the Big Picture investment, using Direct Response's monies by modifying the Amended CapSource Loan. Am. Compl. ¶ 126. The Trustee further alleges that to induce CapSource to approve and amend the Amended CapSource Loan, the Defendants made a prepayment on the Amended CapSource Loan using a Direct Response asset. Am. Compl. ¶ 128-29. [4]

Innovation began experiencing financial difficulties in 2009, and OTMH (controlled by Seaport) directed that Direct Response pay $7.6 million of Innovation's obligations on the outstanding Amended CapSource Loan. Am. Compl. ¶ 139-70. The Trustee alleges that Stewart as CFO directed the $7.6 million in transfers from Direct Response on behalf of Innovation. Am. Compl. ¶ 144. On September 30, 2009, OTMH, Innovation, and Direct Response defaulted on the Amended CapSource Loan. Am. Compl. ¶ 171. On December 14, 2009, CapSource enforced its rights under a deposit control agreement contained in the

---

[4] Defendant Richard Stewart was an employee of Innovation, and in September of 2008 was hired as the Chief Financial Officer of OTMH, Direct Response, and Innovation. Am. Compl. ¶ 131. The Amended Complaint alleges that Seaport's principals, Defendants Collis and Tamashunas, controlled the major corporate decisions of Direct Response through their instructions to Richard Stewart. Am. Compl. ¶ 118.

Innovation Transaction and executed a cash sweep of $5.6 million from Direct Response's bank accounts. Am. Compl. ¶ 194-95.

On January 8, 2010, Direct Response filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code"). Jeoffrey Burtch (the "Trustee") was appointed as the interim Chapter 7 Trustee. On March 31, 2010, the Trustee filed this adversary proceeding against Seaport, OTMH, Innovation, Lastoria, Grae/Sickenius, Eden, Collis, Tamashunas, Meyers, Stewart and CapSource (collectively, the "Defendants") challenging the Debtor's $13.2 million in payments for Innovation's obligations. The Trustee's Amended Complaint seeks from the Defendants the avoidance, recovery and turnover of certain transfers under sections § 544, 547, 548 and actual and constructive fraud to recover transferred property under § 542, 550, and 551, breach of fiduciary duty, aiding and abetting, negligence, conversion, corporate waste, unjust enrichment, to avoid a lien, an accounting, disallowance of claims, and equitable subordination. On April 21, 2011, the Court heard argument on the Motions to Dismiss. On October 3, 2011, this Court directed the parties to submit supplemental briefing to address the applicability, if any, of *Stern v. Marshall*, __U.S.___, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011) on this Court's authority to enter a final order with regard to the claims in the Amended Complaint.

The Trustee alleges that through its control over the Debtor, Seaport used OTMH to cause Debtor to co-guarantee the loan to acquire Innovation. Additionally, the Trustee alleges that Seaport, using the interlocking directorates of OTMH and the Debtor, directed

the Debtor to pay $7.6 million to satisfy Innovation's obligations without any reimbursement, benefit, or fair consideration to the Debtor and unjustly benefitting Innovation, and using Direct Response's moneys to fund the Big Picture acquisition (the "Challenged Transactions").    Below is a brief description of the Claims and the parties they are brought against.

| COUNT | NATURE OF CLAIM | DEFENDANTS |
|-------|-----------------|------------|
| First | Actual Fraudulent Transfer § 548(a)(1)(A) | Seaport, OTMH, Innovation, Collis, Tamashunas, Lastoria, Grae/Sickenius, Stewart |
| Second | Constructive Fraudulent Transfer § 548(a)(1)(B) | Seaport, OTMH, Innovation, Collis, Tamashunas, Lastoria, Grae/Sickenius, Stewart |
| Third | Fraudulent Transfer § 544 | Seaport, OTMH, Innovation, Collis, Tamashunas, Lastoria, Grae/Sickenius, Stewart, Meyers |
| Fourth | Constructive Fraudulent Transfer § 544(b); UFTA[5] § (5)(a); UFCA[6] § (4) | Seaport, OTMH, Innovation, Collis, Tamashunas, Lastoria, Grae/Sickenius, Stewart, Meyers |
| Fifth | Constructive Fraudulent Transfer § 544(b); UFTA § (4)(a)(2); UFCA § (5)&(6) | Seaport, OTMH, Innovation, Collis, Tamashunas, Lastoria, Grae/Sickenius, Stewart, Meyers |
| Sixth | Preference § 547 | Innovation |
| Seventh | Preference §§ 550, 551 | Seaport, OTMH, Innovation, Collis, Tamashunas, Lastoria, Grae/Sickenius, Stewart, Meyers |
| Eight | Turnover § 542 | Innovation |
| Ninth | Accounting | Innovation |
| Tenth | Breach of Fiduciary Duty | OTMH, Collis, Tamashunas, Meyers, Eden, Lastoria |

---

[5] Uniform Fraudulent Transfer Act

[6] Uniform Fraudulent Conveyance Act

| COUNT | NATURE OF CLAIM | DEFENDANTS |
|---|---|---|
| Eleventh | Aiding and Abetting Breach of Fiduciary Duty | Innovation, Grae/Sickenius, Stewart |
| Twelfth | Negligence | OTMH, Collis, Tamashunas, Meyers, Eden, Lastoria |
| Thirteenth | Corporate Waste or Mismanagement | Collis, Tamashunas |
| Fourteenth | Conversion | Collis, Tamashunas |
| Fifteenth | Unjust Enrichment/Constructive Trust/Equitable Liens | Seaport, OTMH, Innovation, Collis, Tamashunas, Grae/Sickenius, Lastoria |
| Sixteenth | Actual and Constructive Fraudulent Transfers § 548(a)(1)(A)&(B) | CapSource |
| Seventeenth | Fraudulent Transfer § 544 | CapSource |
| Eighteenth | Constructive Fraudulent Transfer § 544(b); UFTA § (5)(a); UFCA § (4) | CapSource |
| Nineteenth | Turnover § 542 | CapSource |
| Twentieth | Preference §§ 550, 551 | CapSource |
| Twenty-First | Accounting | CapSource |
| Twenty-Second | Disallowance of Claims § 502(D) | CapSource |
| Twenty-Third | Equitable Subordination | CapSource |
| Twenty-Fourth | Unjust Enrichment/Constructive Trust/Equitable Liens | CapSource |

## III.  DISCUSSION

Defendants seek dismissal of all claims ("Claims") for relief in the Amended Complaint pursuant to F.R.Civ.P. 12(b)(6) and F.R.Bankr.P. 7012, for failure to state a claim upon which relief can be granted.  The question, therefore, is whether the Trustee has sufficiently stated facts which, if proven, entitle him to relief.  If so, the Trustee will have the opportunity to prove the Claims after discovery.

## A.  Rule 12(b)(6) Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) serves to test the sufficiency of the factual allegations in a plaintiff's complaint.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007);  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).  To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain sufficient "factual allegations" which, if true, would establish "plausible grounds" for a claim: "the threshold requirement ... [is] that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.' "  *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955.  "To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible.  This then 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)(quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948-50)).  However, "labels and conclusions" or "formulaic recitation of the elements of a cause of action" are not sufficient.  *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955.  Legal conclusions are not entitled to the presumption of truth. *Ashcroft v. Iqbal*, 566 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  In deciding a motion to dismiss under Rule 12(b)(6), a court tests the sufficiency of the factual allegations and evaluates whether a plaintiff is "entitled to offer evidence to support the claims," and "not whether a plaintiff will ultimately prevail." *Oatway v. Am. Int'l Group, Inc.*, 325 F.3d 184, 187 (3d Cir. 2003). This is true even if "actual proof of those facts is improbable" and "a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

As discussed above, the Court must accept as true all allegations in the Amended Complaint and draw reasonable inferences in a light most favorable to the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Morse v. Lower Merion School District*, 132 F.3d 902, 905 (3d Cir. 1997). However, "a court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." *Sands v. McCormick*, 502 F.3d 263, 267-68 (3d Cir. 2007) (quoting *Morse*, 132 F.3d at 906).

**B.  Impact of *Stern v. Marshall*, on this Court's authority to enter a final orders**

Subsequent to the parties' briefing and the April 2011 oral argument on the Motions, the Supreme Court issued its decision in *Stern*.  The Supreme Court's opinion in that case endeavors to delineate the bankruptcy court's authority to enter final orders on certain core matters.

There are two views as to the effect and holding of *Stern*.  The broad interpretation, espoused by defendants of preference and fraudulent transfer actions, is that *Stern* strips bankruptcy courts of authority to enter a final judgment in any case where the debtor is bringing any action which seeks to augment the estate because they are legal actions that seek to take another's property and can only be finally adjudicated by an Article III judge (the "Broad Interpretation").

Conversely, *Stern* also has been narrowly interpreted by debtors and bankruptcy trustees.  They argue that by its express language, the opinion stands for a narrow proposition of law based on the unique set of facts that was before the Supreme Court in *Stern* and that the Supreme Court did not divest bankruptcy courts of authority to enter

final orders on core matters, other than a Debtor's state law counterclaim. Further, the Supreme Court did not intend to alter the division of labor between the district courts and bankruptcy courts. The narrow interpretation argues that *Stern* does not (1) limit bankruptcy courts' authority to enter final orders in preference or fraudulent conveyance actions (even if those actions seek to augment the estate), or (2) prohibit bankruptcy courts from ruling on a debtor's or trustee's state law counterclaims when determining a proof of claim in the bankruptcy, or when deciding a matter that is directly and conclusively related to the bankruptcy (the "Narrow Interpretation"). Complicating the holding is Justice Scalia's partial concurrence which undermines the rationale set forth by Chief Justice Roberts and the argument that *Stern* is a majority opinion standing for the Broad Interpretation. In the face of confusion, the Court as have many others throughout the nation, will attempt to present a reasoned analysis of the issues before it, based on this Court's interpretation of *Stern*.[7]

### 1. The Case

The facts of the case and ruling by the Supreme Court have been the subject of many opinions and commentary. The extensive writing and discussion result from the potential serious impact of the decision on the authority of bankruptcy courts. Accordingly, the Court will provide a brief summary of the salient facts and holding.

---

[7]  The Court has found in excess of 130 cases in which bankruptcy courts have addressed *Stern*. The analyses and decisions are not consistent.

The death of J. Howard Marshall ("Mr. Marshall") resulted in protracted litigation over his estate between the estates of Vickie Lynn Marshall, better known as sex symbol Anna Nicole Smith, the wife of Mr. Marshall ("Wife"), and E. Pierce Marshall, Mr. Marshall's son ("Son"). The litigation took place in two courts, a Texas state probate court and a federal bankruptcy court. The courts rendered opposite rulings.

Shortly before Mr. Marshall died, Wife claimed in the state court proceeding that Son fraudulently induced Mr. Marshall to sign a living trust agreement that excluded Wife from receiving any portion of Mr. Marshall's estate. The Texas court rejected Wife's claim, ruling in favor of Son. With her state court action pending, Wife filed for bankruptcy. Son then filed a complaint and proof of claim in the bankruptcy court alleging that Wife had defamed him. Wife, in turn, filed a counterclaim seeking damages for Son's alleged tortious interference with Mr. Marshall's promise to Wife of a large sum of money. The bankruptcy court found in favor of Wife. Wife and Son have since died, leaving their estates to continue the case.

Son appealed from the bankruptcy court ruling in Wife's favor. The Ninth Circuit held that the bankruptcy court lacked authority to enter judgment on Wife's counterclaim. The Ninth Circuit found that the counterclaim, based solely on state law, was not a core proceeding.

The Supreme Court affirmed the Ninth Circuit's ruling, but on different grounds, concluding that the bankruptcy court did have statutory jurisdiction under 28 U.S.C. § 157(b) to issue a final judgment on Wife's counterclaim because it was a "core" proceeding.

However, the Supreme Court, in a five-to four decision, ruled that the bankruptcy court lacked the constitutional authority to decide the state law counterclaim to the extent it was not resolved in the process of ruling on Son's proof of claim.  The Supreme Court stressed the differences between Article III and Article I judges, relying on its decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 450 U.S. 50 (1982).

## 2.  *The Broad Interpretation*

Initially, the Supreme Court's opinion in *Stern* distinguishes between Article III judges, who hold a lifetime appointment and guaranteed salary, and non-Article III judges, who do not hold a lifetime appointment, and may have a diminution of salary.  *Stern,* 131 S. Ct. at 2608-09.  The rationale is that the characteristics of Article III judges protect and insulate those judges to ensure an independent judicial branch.  "Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges."  *Stern*, 131 S. Ct. at 2609.

This protection prevents Congress from withdrawing "from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty."  *Id. (quoting Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856)); *See also Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58 (1982) (holding that a bankruptcy court deciding a "state-law contract claim" violated Article III of the Constitution.)  In response to *Marathon*, Congress revised the bankruptcy statutes that govern jurisdiction giving United States district courts original and exclusive jurisdiction of all cases under title 11.  28 U.S.C. § 1334(a).  Congress then statutorily

authorized and enabled federal district courts to refer to bankruptcy judges "all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11." 28 U.S.C. § 157(a). Additionally, Congress authorized bankruptcy judges to "hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1). In essence, bankruptcy courts could "hear and enter final judgment in 'core proceedings' in a bankruptcy case." *Stern,* 130 S. Ct. at 2601-02. As defined in 28 U.S.C. § 157(b)(2), core proceedings include sixteen enumerated matters, including "counterclaims by the estate against persons filing claims against the estate", "proceedings to determine, avoid, or recover preferences" and "proceedings to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. § 157(b)(2)(C)& (F) & (H).

The constitutionality of the statutory authority granted to bankruptcy courts in Section 157(b)(2) to hear core proceedings was unchallenged until the Court decided *Stern*. In *Stern,* the Court held that although the bankruptcy court had statutory authority under 157(b)(2) to enter a final order on a debtor's state law tort counterclaim, it did not have constitutional authority to do so. *Stern*, 131 S. Ct. at 2596-97. The Court noted that *Northern Pipeline v. Marathon* created a public rights exception which permits Congress to constitutionally assign certain cases involving public rights to non-Article III, legislative courts, such as the bankruptcy court. *Id.* at 2597. The *Stern* Court noted that the public rights exception includes those cases "arising 'between the Government and persons subject to its authority in connection with the performance of the constitutional functions

14

of the executive or legislative departments' — and those that are instead matters 'of private right, that is, of the liability of one individual to another under the law as defined.'" *Stern*, 131 S. Ct. at 2598 (quoting *Crowell v. Benson*, 285 U.S. 22, 50, 51 (1932). Accordingly, the Court concluded that the exception did not include the adjudication of the debtor's state law counterclaim. *Id.* at 2597-98.

The *Stern* Court also revisited its analysis in an earlier case, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), where the Court held that fraudulent conveyance and preferential transfer action defendants who had not submitted proofs of claim against the bankruptcy estate were entitled to a jury trial, and therefore did not fall within the public rights exception. *Id.* at 56. In the context of a defendant who had not submitted a proof of claim against the estate, the Court noted that both fraudulent conveyance and preferential transfer cases were "quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res." *Id.* In other words, avoidance actions are the kinds of cases that under the Constitution require adjudication by an Article III judge, as *Stern* reaffirmed through its reaffirmance of *Granfinanciera*. 131 S. Ct. at 2614.

Prior to *Stern,* and established by *Granfinanciera*, the Supreme Court had carved out an exception allowing bankruptcy courts to enter final orders on avoidance actions provided that the avoidance action defendant had filed a proof of claim against the estate. *Granfinanciera*, 492 U.S. at 57-58. The rationale was that the filing of the proof of claim turns

what in essence is a plenary action at law only triable by a jury, into an action in equity

capable of being adjudicated by the bankruptcy court because it arises as part of the process

of allowance and disallowance of claims. *Id.* (citing *Katchen v. Landy*, 382 U.S. 323, 386

(1966); *see also Schoenthal v. Irving Trust Co.*, 287 U.S. 92, 53 S.Ct. 50)).[8]  In *Stern*, the Supreme

Court revisited this analysis in *Granfinanciera*, and considered the affect of the avoidance

action defendant's filing of his proof of claim.[9]  Relying in part, on *Granfinanciera*, the

Supreme Court concluded that it lacked authority to adjudicate the debtor's counterclaim,

despite the defendant having submitted a proof of claim against the debtor, because the

purpose of the counterclaim was to augment the bankruptcy estate.  *Stern*, 131 S. Ct. at

2618.  The distinction set forth in *Granfinanciera*, and reaffirmed by *Stern,* between actions

that seek to augment the estate and those that seek a "pro rata share of the bankruptcy res"

is critical to determining whether the claims must be heard by an Article III judge.  Relying

---

[8]  The *Granfinanciera* Court noted that if the avoidance action defendant had not filed a proof of claim against the estate, the defendant would have been entitled to a jury trial if the bankruptcy trustee was solely seeking legal relief, rather than equitable relief. *Granfinanciera*, 492 U.S. at 58 n.13.

[9]  To the extent that *Stern* is inconsistent with *Granfananciera*, *Stern* now appears to remove the possibility, left open by *Granfinanciera*, that the bankruptcy court would have authority to adjudicate a claim to a final order of a defendant who has filed a proof of claim against the estate.  In *Granfinanciera*, the Court made clear that a court deciding a fraudulent conveyance action was exercising Article III judicial power, but relying on 157(b)(2), that the exercise of that power was constitutional. *Granfinanciera*, 492 U.S. at 48-49.  The Court did not disturb the basic premise that the bankruptcy court's statutory authority to enter final orders under § 157(b)(2) was constitutional.    The Broad Interpretation suggests that this premise is no longer true.  *Stern* can fairly be read for the proposition that regardless of whether the defendant has filed a proof of claim against the estate, if the debtor's action seeks to "augment the bankruptcy estate" the action can only be adjudicated to a final judgment by an Article III court. *Stern*, 131 S. Ct. at 2618.

on that analysis, *Stern* can be interpreted to hold that actions that seek to augment the bankruptcy estate require adjudication through an Article III court, because they are legal actions that seek, through a money judgment, to take the defendant's property.  *Id.*

The Broad Interpretation argues that *Stern's* guidance on the bankruptcy courts' authority to enter final judgments is threefold: (1)  the adjudication of a debtor's state law counterclaim against a defendant who had filed a proof of claim in the bankruptcy case, did not fall within the public rights exception; (2) the *Stern* Court reaffirmed the *Granfinanciera* Court's distinction between the two types of actions that the estate might assert against a defendant; and (3) the Supreme Court held that actions which seek to augment the estate, which presumably would include avoidance actions, require adjudication by an Article III court because those legal actions seek through a money judgment to take the defendant's property and that adjudication can only be made by a member of the independent Article III judiciary.  If this Court were to agree with the Broad Interpretation of *Stern*, it would thereby hold that it no longer has authority to make final adjudications on a bankruptcy estate's avoidance action claims against defendants, even if those defendants filed proofs of claim against the estate, and where the bankruptcy estate's claims seek to "augment the bankruptcy estate" by obtaining a money judgment and taking the defendant's property.[10]  Additionally, if this Court were to adopt the Broad

---

[10] Other bankruptcy courts have arrived at the same conclusion.  *See In re Teleservices Group, Inc.*, 2011 WL 3610050 (Bankr. W.D. Mich. August 17, 2011) (holding that the bankruptcy court could not adjudicate the debtor's fraudulent conveyance proceeding against a bank because "only an Article III judge can enter a judgment associated with the

(continued...)

Interpretation of *Stern,* the Court would not have constitutional authority to enter final judgments with respect to the counts alleged in the Amended Complaint.  The Court would have to issue a report and recommendation to the District Court.  *See In re Teleservices Group, Inc.*, 2011 WL 3610050, at *19.  The District Court would then have to decide whether to accept the report and recommendation in making its own decision as to whether a final judgment should be entered with regard to the Motions to Dismiss.

### 3.  *The Narrow Interpretation*

The Narrow Interpretation argues that *Stern* was by the express language in the opinion intended to be very narrowly construed.  Additionally, the Narrow Interpretation argues that the holding only specifically removed a debtor's state law counterclaims under § 157(b)(2)(C), as a subset of core proceedings under § 157(b)(2), from final adjudicatory authority of the bankruptcy court.  The holding was not intended to remove all core proceedings under 28 U.S.C. § 157(b)(2) from final adjudicatory authority of the bankruptcy

---

[10](...continued)
estate's recovery of contract and tort claims to augment the estate."  *Id.* at *2-3.  That fact does not change "by making the recovery part of the claims allowance process."  *Id.* Regardless of whether or not the defendant filed a proof of claim against the estate to make the recovery part of the claims allowance process, actions or defenses based on state law or federal avoidance actions, cannot be adjudicated to a final order by a non-Article III judge "if the relief sought by the estate included the involuntary recovery of property from a third party" for purposes of augmenting the estate.  *Id.* at 13 n.59.); *In re Canopy Financial, Inc.*, 2011 WL 3911082 (N.D. Ill. Sept. 1, 2011) (holding that the bankruptcy court could not adjudicate through final orders a fraudulent conveyance action); *In re Blixseth*, 2011 WL 3274042 (Bankr. D. Mont. Aug. 1, 2011) (same); *In re Sitka Enters.*, No 10-18147, 2011 LEXIS 3040 (Bankr. D.V.I. August 5, 2011) (holding that because the trustee's action to recovery fraudulent conveyances under sections 548 and 549 of the Bankruptcy Code involves private rather than public rights, the fraudulent conveyance actions could not be adjudicated by the Bankruptcy Court since it lacks constitutional authority to do so).

courts.  Indeed, such a holding would turn the bankruptcy process on its head and would "meaningfully change the division of labor" between the bankruptcy courts and the district courts, in essence making the bankruptcy court an adjunct or magistrate of the district courts for all core proceedings as defined in 28 U.S.C. § 157(b)(2).

Chief Justice Roberts' majority opinion repeatedly emphasizes the narrowness of the Court's decision and repeats the Supreme Court's insistence that the decision is limited. The Court attempted to make it clear that it was invalidating one aspect of the bankruptcy court's authority over core proceedings – where a debtor asserts a state law counterclaim against a creditor who filed a proof of claim in the bankruptcy case.  *Stern*, 131 S. Ct. at 2620 The Court must honor the Chief Justice's express limitations and assurances regarding the narrowness of the minimal breadth of the decision.[11]  Those express limitations define the

---

[11]  Proponents of the Broad Interpretation disregard the multiple stated references that the impact of the decision was "narrow" was not intended to "meaningfully change the distribution of labor" between the bankruptcy courts and district courts.  The Court very expressly and intentionally insisted on the limited intended impact of its decision. *Stern*, 131 S. Ct. at 2620 ("We conclude today that Congress, in one isolated respect, exceeded that limitation . . .").  The Court is convinced that the Supreme Court did not intend to eliminate core matters such as deciding preference and fraudulent conveyance actions from the final adjudicatory authority of the bankruptcy courts.  The bankruptcy courts' authority to render a final adjudication with regard to those types of core matters is something that the Supreme Court may have to address in the future, specifically, whether the restructuring of the debtor-creditor relationship is, or should be, part of the public rights exception.  Arguably, now under the Supreme Court's sometimes inconsistent public rights jurisprudence coupled with a very broad reading of *Stern*, the argument can be made that the classification of fraudulent conveyance and preference actions as core proceedings under § 157(b)(2)(H) & (F) violates Article III of the Constitution.  This argument is premised on the conclusion that the restructuring of debtor-creditor relations is not in fact a public right - a proposition of law that has never been stated by the Supreme Court.  This Broad Interpretation cannot be given much weight because the majority

(continued...)

narrow reach of the decision and cannot be simply disregarded as *dicta*.

Moreover, assuming, *arguendo*, that the Broad Interpretation is correct, it did not receive a majority of the votes on the Supreme Court. Justice Scalia's partial concurrence in the judgment, while disavowing the majority's rationale, requires that even if the opinion is broadly interpreted to hold that bankruptcy courts no longer have authority to make a final adjudication on core matters that seek to "augment the estate" such as fraudulent transfer and preference actions, that proposition of law only received plurality support of four justices, and is not a binding holding on this Court.

This variation of the Narrow Interpretation argues that Justice Scalia's partial concurrence in the judgment requires *Stern* to be narrowly interpreted as a 4-4-1 plurality. In his partial concurrence, Justice Scalia joined in the judgment, but he did not adopt the reasoning of the Chief Justice's opinion. *Stern*, 131 S.Ct. at 2620-21. He instead reached his concurrence utilizing a very different analysis. *Id.* Accordingly, a majority of the justices did not adopt the rationale of Chief Justice Roberts' opinion, giving impetus to a narrow interpretation.

---

[11](...continued)
opinion specifically pointed out that the Court has never determined whether any part of the bankruptcy process involves public rights, and that through *Stern* and its progeny, the Court has expressly refrained from "'suggest[ing] that the restructuring of the debtor-creditor relations is in fact a public right.'" *Stern*, 131 S. Ct. at 2614 n.7 (*quoting Granfinanciera*, 492 U.S. 33, 56 n.11 (1989)). Arguably, the constitutional validity of the bankruptcy courts' entire decision making authority may still be in question, an issue the Supreme Court did not decide in *Stern*. *See* Nat'l Bankr. Conf. Comm. on Ct. and the Admin. Sys., The Scope and Implications of Stern v. Marshall, 131 S.Ct. 2594 (2011) (Oct. 26, 2011) (unpublished).

After concurring in the judgment, Justice Scalia scrutinized the rationale of the Roberts opinion. *Id.* Justice Scalia noted that the Roberts opinion's analysis that balances the benefits and harms of seven factors to conclude that an Article III judge was required to adjudicate the lawsuit, indicated that "something is seriously amiss with our jurisprudence in this area." *Id.* at 2621. Critiquing the seven factors approach, Justice Scalia asserted that the tests cited in the Roberts opinion's analysis are flawed because of (1) the numerosity of the tests, and (2) the tests have nothing to do with "the text or tradition of Article III." *Id.* In effect, Justice Scalia completely disavowed the Roberts opinion's rationale. Instead, Justice Scalia presented his own rationale that starts with an overarching premise that "an Article III judge is required in *all* federal adjudications." *Id.* He then adopted several exceptions to the general rule which include (I) "certain adjudications by federal administrative agencies," and (ii) federal adjudications with "a firmly established historical practice[.]" *Id.* Finally, he suggested that historical practice might "permit non-Article III judges to process claims[.]" *Id.* However, because the issue was not briefed, Justice Scalia declined to take a position. *Id.*

Narrow Interpretation proponents argue that because Justice Scalia disagreed with the Chief Justice's rationale and underpinnings, but only partially concurred in the judgment, the decision is a 4-4-1 plurality that must be "narrowly" interpreted.

If this Court were to grant the Defendants' Motions to Dismiss and deny the Trustee's request, it would dramatically restructure the division of labor between district courts and bankruptcy courts by requiring that district courts hear most adversary

21

proceedings.  *See Walker, Truesdell, Roth & Assoc.'s v. The Blackstone Group LP (In re Extended Stay Inc.), S.D.N.Y., No. 11-Civ. 5394 (SAS), Adv. Pro. No. 11-2398, 11/10/11)* (holding that *Stern* does not require mandatory withdrawal of the reference under 28 U.S.C. § 157(d)). Reading *Stern* as standing for the Broad Interpretation, i.e.,  that a bankruptcy court does not have constitutional authority to make a final adjudication of a fraudulent transfer or preference cause of action for the purpose of augmenting the estate, would essentially strip the bankruptcy court of a authority to hear a significant portion of its typical docket, as well as reduce the role of the bankruptcy court.  If, *Stern* was meant to be read "narrowly," and not to "meaningfully change the division of labor" between the district and bankruptcy courts, the Supreme Court could not have intended to strip the bankruptcy court of authority to adjudicate to finality those traditional core bankruptcy issues.

### 4.  The Court's Adopted View

This Court disagrees that the *Stern* decision stands for the Broad Interpretation and proposition that a non-Article III court does not have authority to enter a final judgment on a preference or fraudulent conveyance claim brought by the Debtor to augment the estate, or any other core claim (as defined in 28 U.S.C. § 157(b)(2)) that is not a state law counterclaim.  The Broad Interpretation is based on a holding that the Supreme Court has never made, namely, that restructuring of the debtor-creditor relationship is not a public right, nor falls within any other exception that would permit a non-Article III court to finally adjudicate those matters.  As previously stated, the Supreme Court expressly took measures to limit the reach and breadth of its opinion and its interpretation by lower

courts.

The Court adopts the Narrow Interpretation and holds that *Stern* only removed a non-Article III court's authority to finally adjudicate one type of core matter, a debtor's state law counterclaim asserted under § 157(b)(2)(C). By extension, the Court concludes that *Stern* does not remove the bankruptcy courts' authority to enter final judgments on other core matters, including the authority to finally adjudicate preference and fraudulent conveyance actions like those at issue before this Court.

Other courts have adopted the Narrow Interpretation of *Stern*.[12][13] Most recently, in

_____

[12] *See also In re Ambac Fin. Grp., Inc.*, No. 10-15973, — B.R. —, 2011 WL 4436126, at *8 (Bankr. S.D.N.Y. Sept. 23, 2011) ("Stern v. Marshall has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court."); *In re Salander O'Reilly Galleries*, 453 B.R. 106, 115-18 (Bankr. S.D.N.Y. July, 18 2011) (*Stern* "should be limited to the unique circumstances of that case" and "does not remove from the bankruptcy court its jurisdiction over matters directly related to the estate that can be finally decided in connection with restructuring debtor and creditor relations"); *see also In re Heller Ehrman LLP*, 2011 WL 4542512, at *1 ("Withdrawal of the reference at this time would amount to an unnecessary extension of the narrow holding in *Stern*, would be an inefficient use of judicial resources by overburdening the district court and foregoing the services of a bankruptcy court ready, willing and able to do its job and would distort the traditional way to challenge and decide the constitutionality of a federal statute."); *In re Safety Harbor Resort and Spa*, Adv. Pro. No. 06-50826, — B.R. —, 2011 WL 3240596, at *10 (Bankr. M.D. Fla. Aug. 30, 2011) (holding that *Stern* does not preclude bankruptcy courts from adjudicating core claims, but rather that it is a "narrow" holding that Congress exceeded the limits of Article III in "one isolated respect"); *In re Olde Prairie Block Owner, LLC*, No. 10 B 22668, — B.R. —, 2011 WL 3792406, at *5 (Bankr. N.D. Ill. Aug. 25, 2011) (*Stern* has a "narrow effect"); *In re Am. Bus. Fin. Servs., Inc.*, Adv. Pro. No. 06- 50826, — B.R. —, 2011 WL 3240596, at *2 (Bankr. D. Del. July 28, 2011) (holding that bankruptcy courts have the authority to decide matters "directly and conclusively related to the bankruptcy" and granting summary judgment to defendants on avoidance and state law claims brought by trustee) (quotations omitted).

[13] In *In re Washington Mutual, Inc.*, 2011 WL 4090757 (Bankr. D. Del. Sept. 13, 2011), Judge Walrath adopted Justice Scalia's rationale and stated that bankruptcy courts have

(continued...)

*In re USDigital, Inc.*, 2011 WL 6382551 (Bankr.D.Del., Dec. 20, 2011) Judge Sontchi had to determine whether a state law claim for equitable subordination was a core or a non-core proceeding and secondly, *Stern*'s applicability and effect on the Court's judicial authority to enter final orders.   Judge Sontchi framed the Court's analysis in two parts.   First, the matter at issue must meet the statutory definition of a core proceeding.  *Id.* at *10-11.  If the matter is determined non-core, the bankruptcy judge has no latitude to enter a final order and may only issue a report and recommendation.  *Id.*  However, if the matter is within the definition of a core proceeding, then the bankruptcy court must determine whether under *Stern* the bankruptcy court has constitutional authority to enter a final order on that core proceeding. *Id.* at *5.

First the Court in *In re USDigital, Inc.*, determined whether a claim for equitable subordination was a "core proceeding" under the statute.  The *USDigital* Court noted that equitable subordination did not fall within one of Congress' specifically enumerated core proceedings in 157(b).  *Id.* at *10-11.  Nonetheless, the *USDitigal* Court noted that 157(b) is not an exhaustive list of core proceedings and then turned to Third Circuit precedent to inform its decision on whether it was a core proceeding.  *Id.* at *14.  Relying on *Shubert v.*

---

[13](...continued)
historically entered final judgments on compromises.  Judge Walrath decided that as reflected in the concurring opinion in Stern, bankruptcy judges have authority to approve of the compromise without having to submit a report and recommendation to the District Court. *Id.* at *2-3.  Additionally, Judge Walrath stated that the decision on compromise was within the bankruptcy court's core jurisdiction because it dealt with a determination of what is property of the estate under Bankruptcy Code § 541.  *Id.* at *5.

*Lucent Techs. (In re Winstar Communs., Inc.),* 554 F.3d 382, 405 (3d Cir. 2009), the *USDigital*

Court held that a proceeding is core if (1) it is listed in 157(b) or (2) if the matter "invokes

a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could

arise only in the context of a bankruptcy case." *In re USDigital, Inc.*, 2011 WL 6382551, *14.

The *USDigital* Court then held that equitable subordination was a substantive right

provided by title 11, thus making that count a core proceeding under the statute. *Id.* at *15.

Next, the *USDigital* Court had to determine whether *Stern* was applicable to the equitable

subordination count. The *USDigital* Court determined that in light of the "letter and the

spirit of the Supreme Court's holding" *Stern* had to be read narrowly. *Id.* at *19. The

*USDigital* Court then walked through several examples of the narrow and limiting

language of *Stern* which would require a narrow interpretation. *Id.* at *24-27. However, the

*USDigital* Court also acknowledged that there are a number of statements in *Stern* that

could support a broad interpretation, similar to that argued by the defendants in the

present case. *Id.* at *19-24. The *USDigital* Court very astutely noted this internal conflict

of the *Stern* opinion and the significant interpretation problems it has caused. Nonetheless,

the *USDigital* Court relied on the repeated references to the limited impact the Supreme

Court believed *Stern* would have, based on the narrow question before the Court. *Id.* at

*24-25. The *USDigital* Court again correctly noted that had the Supreme Court intended

*Stern* to be interpreted as rendering all core state law claims raised within the bankruptcy

court an unconstitutional exercise of Article III power, the Supreme Court would not have

repeatedly characterized that infraction as "slight" or merely "obnoxious in its mildest and

least repulsive form". *Id.* at *26.

Relying on the repeatedly and explicitly stated references to the narrow and limited impact of the opinion, the *USDigital* Court held that the plain language required that *Stern* be interpreted narrowly and stands for the sole proposition that the bankruptcy court "lacked constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at *20 (*citing Stern*, 131 S.Ct. at 2620). In conclusion, the *USDigital* Court cautioned that "to expand the reach of the opinion farther is to do violence to its plain meaning." *Id.* at *27. Based on this the *USDigital* Court held that equitable subordination is a non-enumerated core proceeding under 157(b) and that *Stern* was inapplicable because the count was not a state law counterclaim to a proof of claim filed by the Trustee. *Id.* at 28.

Similarly, in the present case the Trustee seeks to recover alleged preferences and fraudulent transfers as property of the estate, and, thus, are within the Court's core jurisdiction. Additionally, the alleged transfers that the Trustee complains of arguably may have led to the filing of the Chapter 7 petition. Without the bankruptcy filing, there would not have been state law causes of action. The preference and fraudulent transfer claims arise both under Title 11 and in a case under Title 11 and are by definition "core" issues under § 157(b)(2)(F) & (H) for which a bankruptcy court has authority to enter final adjudications.

### C. Fiduciary Duty Claims[14]

#### 1. *Applicable Law*

The internal affairs doctrine provides that only the state of incorporation has the authority to regulate a corporation's internal affairs. *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). "Few, if any, claims are more central to a corporation's internal affairs than those relating to alleged breaches of fiduciary duties by a corporation's directors and officers." *In re Fedders North America, Inc.*, 405 B.R. 527, 539 (Bankr.D.Del.2009) (citing *In re Topps Co. S'holders Litig.*, 924 A.2d 951 (Del.Ch.2007)). The claims addressing breaches of fiduciary duties and related claims involve the internal affairs of Debtor, and the laws of the state of incorporation control. The Court will therefore apply Delaware law in its decision. The remaining claims are subject to the Bankruptcy Code.

#### 2. *Breach of Fiduciary Duty Claims Against the Board Defendants*

As an initial matter, several of the Defendants have argued that the Trustee's breach of fiduciary duty claims that arose from entering into the Amended CapSource Loan, are time-barred by the three year statute of limitations. The Court agrees. Delaware has a three year statute of limitations to assert claims for breaches of fiduciary duties. 10 Del. C. § 8106. The general rule in Delaware is that "the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action." *Whittington*

---

[14]    The discussion does not address the Trustee's claims against Defendant CapSource. The Claims asserted against Defendant CapSource are discussed *infra*, at page 55.

*v. Dragon Group*, *L.L.C.*, 2009 WL 4419075, at 5 (Del. Ch. Sept. 30, 2008)(*quoting In re Dean Witter P'ship Litig.*, 1998 Del. Ch. LEXIS 133, at 15 (Del. Ch. July 17, 1998)).  "Where a plaintiff brings a claim based on multiple allegedly wrongful acts, a court considers each act in turn in applying the statute of limitations." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 562 (Bankr. D. Del. 2008).  The Bankruptcy Code provides a two-year extension of the statute of limitation from the filing of bankruptcy, but that extension only applies if the limitations period had not expired prior to the filing date. 11 U.S.C. § 108(a).  *See also Cantor v. Perelman,* 414 F.3d 430, 440 (3d Cir. 2005).

The Amended CapSource Loan was entered into and approved on September 29, 2006.  In this case, the extension is inapplicable because the limitations period expired prior to the bankruptcy filing on January 8, 2010.  Therefore, to be timely filed under Delaware's three year statute of limitations, the claim would have to have been filed before September 29, 2009.  The Trustee's first Complaint in this adversary proceeding was not filed until March 31, 2010.  Consequently, the Trustee's fiduciary duty claims related to the Amended CapSource Loan are time-barred.  As a result, the Trustee is only permitted to bring claims for breach of fiduciary duties for actions that occurred between March 31, 2007, and March 31, 2010.  Therefore, the Court will dismiss any breach of fiduciary duty claims that are based on alleged actions or decisions the defendants made prior to March 31, 2007.  This will preclude any breaches of fiduciary duty based on the original February 26, 2006, CapSource loan, or the September 29, 2006, Amended CapSource Loan.    Any other allegedly wrongful actions or decisions by the defendants post March 31, 2007, including

(1) the November 2007, Big Picture acquisition and modification to the Amended CapSource Loan to accomplish that acquisition and (2) the early 2009 transfer of $7.6 million by Direct Response to CapSource to pay Innovation's obligations, come within the statute of limitations and are properly before this Court.

Directors of a Delaware corporation have a triad of fiduciary duties to uphold: the duties of care, loyalty, and good faith. These fiduciary responsibilities do not operate intermittently and are "one of the most important methods of regulating the internal affairs of corporations, as these cases articulate the equitable boundaries that cabin directors' exercise of their capacious statutory authority." *In re Topps Co. S'holders Litig.*, 924 A.2d at 960. The Trustee alleges that the Board Defendants intentionally abandoned their fiduciary duties and instead served their own best interests and Innovation's best interests. In supporting his claims, the Trustee references instances of alleged misconduct by the Board Defendants surrounding the Amended Capstone Loan including: (1) using the interlocking directorates of OTMH, Seaport and Direct Response to induce, approve, and using Direct Response's moneys fund the Big Picture acquisition and modify the terms of the Amended CapSource Loan to accomplish that acquisition, (2) through interlocking directorates, Innovation, Seaport and OTMH directing, that Direct Response pay $7.6 million of Innovation's obligations under the Amended CapSource Loan, despite Direct Response having satisfied and repaid its obligations under the Amended CapSource Loan, (3) failure to reimburse Direct Response for its $7.6 million payment under the Amended CapSource Loan, resulting in unjust enrichment to Innovation.

29

The Board Defendants contend that the Trustee's claim for aiding and abetting a breach of fiduciary duties must be dismissed because the Board Defendants did not owe any fiduciary duty to the Debtor.  Moreover, they contend that assuming they owed a fiduciary duty to the Debtor, no breach of those duties occurred and the Amended Complaint lacks sufficient facts to overcome the presumptions of the business judgment rule. Additionally, the Board Defendants argue that they are exculpated from personal liability because Debtor's certificate of incorporation contains a provision that, when read in conjunction with the Delaware General Corporation Law, 8 Del. C. § 102(b)(7), requires the Court to dismiss the duty of care claims.  Section 102(b)(7) provides:

> (b) In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:
>
> * * *
>
> (7) A provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (I) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit....

8 Del. C. § 102(b)(7).

The breach of fiduciary duty claims against the Board Defendants are derivative claims as the Trustee stands in the shoes of the Debtor.  The issue, therefore, is how the Challenged Transactions, which further obligated the Debtor on a loan from which it did not benefit, harmed the Debtor.  More to the point, what facts does the Trustee advance to

demonstrate that the Board Defendants breached duties leading to injury to the Debtor?

The Amended Complaint contains the following specific factual allegations:

- Defendant Seaport controlled 83.9% of the shares of OTMH.  Am. Compl. ¶ 51.
- Defendant Seaport's principals Collis, Tamashunas, and Meyers were majority members of the OTMH and Direct Response Board.  Am. Compl. ¶ 56-60.
- Eden was president and direct of both OTMH and the Debtor.  Am. Compl. ¶¶ 30, 55-59.
- Seaport as the controlling shareholder of OTMH, through OTMH, purchased Innovation.  Am. Compl. ¶¶ 69, 77-83.
- Debtor's corporate formalities were not observed and from September 29, 2006 through December 2009 the Debtor did not hold a single board meeting.  Am. Compl. ¶ 146.

- Direct Response, which was under the control of Seaport, its controlling shareholder, became a co-borrower and co-guarantor, jointly and severally liable with Innovation for the $19 million derived from the Amended CapSource Loan. Am. Compl. ¶¶ 70, 200-201, 248, 251, 254, 256.
- The proceeds of the $19 million to purchase Innovation, went to Innovation's founders, Grae/Sickenius and Lastoria.  Am. Compl. ¶ 105.
- The Amended CapSource Loan rendered the Debtor insolvent.  Am. Compl. ¶ 11.
- Debtor received no value or benefit for incurring the $19 million secured debt obligation.  Am. Compl. ¶¶ 6, 9, 101, 105-106, 108-109, 130, 197, 232.
- In 2009 Seaport, through the interlocking directorates of OTMH, Direct Response, and Innovation directed the Debtor to pay $7.6 million of Innovations' obligations under the Amended CapSource Loan.  Am. Compl. ¶¶ 140-145, 149, 151-155, 159-170, 177-186, 228-235, 253, 258.
- As of January 31, 2009, Debtor had paid in full their obligations under the Amended CapSource Loan, and did not receive any repayment, benefit, or value from the Defendants for payments made to CapSource on Innovation's behalf.  Am. Compl. ¶¶ 138-139, 242(a).
- By May 2009, the Defendants were given notice that the $7.6 million of transfers would result in a cash flow crisis with the Debtor unable to pay their obligations. Am. Compl. ¶ 155.
- On September 30, 2009, Innovation, OTMH, and Direct Response defaulted on the Amended CapSource loan covenants.  Am. Compl. ¶¶ 120-123, 156, 171-173, 196.
- On December 14, 2009, CapSource executed a cash sweep of $5.6 million from the Debtor's bank accounts.   Am. Compl. ¶¶ 194-198, 202, 242.
- On December 15, 2009, Direct Response's counsel Edwards, Angell, who also served as counsel to Seaport, OTMH, and Innovation, informed Direct Response that it could no longer serve as its counsel, indicating that the interests of the four clients

were adverse. *Id.* at ¶ 204.

Under Delaware law, when a wholly-owned subsidiary is insolvent, the officers and directors of that subsidiary owe fiduciary duties to that subsidiary and its creditors. *Claybrook v. Morris*, 344 B.R. 283 (Bankr. D. Del. 2006). "Directors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters the zone of insolvency. The reasoning for this is that when a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent for the residue of risk bearers, but owes its duty to the corporate enterprise." *Id.* at 288 n.2. "Under Delaware law, creditors of an insolvent corporation are owed fiduciary duties." *Geyer v. Ingersoll Publ'ns*, 621 A.2d 784, 787 (Del. Ch. 1992).

The Trustee asserts that the $7.6 million transfer from Direct Response to pay Innovation's obligation's depleted Direct Response's asset base and rendered it insolvent. Am. Compl. ¶¶ 159-60, 234-35. The directors of a wholly-owned subsidiary cannot allow the subsidiary to be plundered for the parent company's benefit. *RSL COM PRIMECALL, INC. v. Beckoff*, 2003 WL 22989669, at *13 (Bankr. S.D.N.Y. 2003). The Delaware Court of Chancery considered the issue in *Trenwick Am. Litig. Trust v. Ernst & Young,* and stated that "one might conceive that the directors of a wholly-owned subsidiary owe a duty to the subsidiary not to take action benefitting a parent corporation that they know will render the subsidiary unable to meet its legal obligations." 906 A.2d 168, 203 (Del. Ch. 2006). The Trustee alleges that although Innovation was experiencing financial difficulties, the

defendants made the Big Picture Acquisition using Direct Response's monies by modifying the Amended CapSource Loan.  Am. Compl. ¶ 126.  The Trustee asserts that the $7.6 million transfer from Direct Response to pay Innovation's obligations depleted Direct Response's asset base, such that it was rendered insolvent.  The Board Defendants were aware that this action did not benefit Direct Response and were warned on multiple occasions that it would render Direct Response unable to meet its obligations. Am. Compl. ¶¶143-44, 158-59,74, 151-53, 163-64, 169, 228.   Based on Delaware law, the director defendants of the wholly owned subsidiary, Direct Response, owed fiduciary duties to the subsidiaries' creditors once it became insolvent.

The factual allegations in the Amended Complaint re-stated above, which are taken as true, establish a plausible ground for a claim that the Defendants breached their fiduciary duties.  The factual allegations alleged in the Amended Complaint are sufficient to entitle the Trustee to offer evidence to support the claims.  Therefore, the Motions of all of the Defendants are denied as to the post-limitations actions.

### 3.  102(b)(7) Analysis

Debtor's certificate of incorporation contains an exculpation clause for breaches of the duty of care in accordance with Section 102(b)(7) of the Delaware General Corporation Law, 8 Del. C. § 102(b)(7).  Article "FIFTH" of the Debtor's Certificate of Incorporation provides:

> FIFTH: No Director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director; provided, however, that the foregoing clause shall not apply to any liability of a Director (I) for any breach of the Director's duty of

loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii)under section 174 of the General Corporation Law of Delaware, or (iv) for any transaction from which the Director derived an improper personal benefit.  This Article shall not eliminate or limit the liability of a Director for any act or omission occurring prior to the time this Article became effective.  (D.I. 80 Exhibit A, at 2).

Section 102(b)(7) of the Delaware General Corporation Law permits a corporation, by so providing in its certificate of incorporation, to protect its directors from monetary liability for duty of care violations.  5 Balotti & Finkelstein, *The Delaware Law of Corporations and Business Organizations*, Ch. 4, § 4.19, p. 200.10 (1986); *see also John Hancock Capital Growth Management Inc. v. Aris Corp.*, Del. Ch., C.A. No. 9920, Jacobs, V.C., Mem.Op. at 4, 1990 WL 126656 at *2 (Aug. 24, 1990).

One of the primary purposes of section 102(b)(7) is to encourage directors to undertake risky, but potentially value-maximizing, business strategies, so long as they do so in good faith. *Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 777 (Del.Ch.2004). However, exculpation clauses do not eliminate personal liability without limitation. The Delaware Supreme Court has held that when a duty of care breach is not the exclusive claim, a court may not dismiss based solely upon an exculpatory provision.[15]   The Delaware Supreme Court stated in *Emerald Partners*:

> [T]he shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 Del.C. § 102(b)(7) is in the nature of an affirmative defense. Defendants seeking exculpation under such a provision will normally bear the burden of establishing each of its elements.... Nonetheless,

---

[15]  *Malpiede v. Townson*, 780 A.2d 1075, 1090-96 (Del.2001); and *Emerald Partners v. Berlin*, 787 A.2d 85 (Del.2001).

where the factual basis for a claim solely implicates a violation of the duty of care, this Court has indicated that the protections of such a charter provision may properly be invoked and applied.

*Emerald Partners*, 726 A.2d at 1223-24.

Exculpation clauses also constitute affirmative defenses according to the Court and the Third Circuit Court of Appeals. "The exculpation clause is an affirmative defense and the determination of the viability of that defense is not proper at [the dismissal] stage." *In re The Brown Schools*, 368 B.R. 394, 401 (Bankr.D.Del.2007); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238, 242 (3d Cir.2005) (stating that exculpation provisions are affirmative defenses that generally can not form the basis of a Rule 12(b)(6) dismissal). However, where a complaint does not adequately contain facts supporting a claim that directors acted in bad faith or conscious disregard of their responsibilities, Rule 12(b)(6) dismissal is appropriate. *Malpiede*, 780 A.2d at 1093; *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 733-34 (Del.Ch.1999), aff'd *sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del.2000). *See also*, *In re Caremark Int'l Deriv. Litig.*, 698 A.2d 959, 971 (Del.Ch.1996), requiring a plaintiff to show a "sustained or systematic failure of the board to exercise oversight...."

The court in *Caremark* defined "a sustained or systematic failure" as either an utter failure to implement reporting or information controls or a conscious failure to monitor, "thus disabling [the fiduciaries] from being in-formed of risks or problems requiring their attention." *Id.* at 970.

The Court concludes, based on the Amended Complaint, that the Trustee has pled sufficient facts to create a plausible claim that the Board Defendants violated their fiduciary

duty of care.  To the extent the Board Defendants violated their fiduciary duty of care, the

exculpation clause in the Debtor's Certificate of Incorporation may shield them as an

affirmative defense, however it cannot be raised at the 12(b)(6) motion to dismiss stage,

because the Amended Complaint has stated sufficient facts supporting a claim that

directors acted in bad faith or conscious disregard of their responsibilities.  *See In re Tower

Air, Inc.*, 416 F.3d at 238, 242; *Malpiede*, 780 A.2d at 1093; *In re Lukens Inc. S'holders Litig.*, 757

A.2d at 733-34 (Del.Ch.1999), aff'd *sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del.2000).

Therefore, the Motion to Dismiss is denied for the post-limitations acts as to all the

Defendants.

### 4.  *Duty of Loyalty and Duty of Good Faith Analysis*

The Court's inquiry does not end with 102(b)(7) and the duty of care analysis, which

is but one of the triad of duties. The Board Defendants also had responsibility to perform

their duties with loyalty and good faith.[16]

The duty of loyalty mandates that a corporate fiduciary act with "undivided and

unselfish loyalty to the corporation" and that "there shall be no conflict between duty and

self-interest." *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983)(*citing Guth v. Loft, Inc.*, 5 A.2d

503, 510 (Del.1939)).  There are two ways to breach the duty of loyalty: (1) self-dealing and

---

[16] Leading experts on Delaware corporate law make a powerful case for the theory
that good faith is at the core of the duty of loyalty and is not a separate duty. The authors
conclude that "good faith" is the "state of mind required of a loyal director." *See* Leo E.
Strine, Jr., Lawrence A. Hammermesh, R. Franklin Balotti & Jeffery M. Gorris, Loyalty's
Core Demand: The Defining Role of Good Faith in Corporation Law, at 4. (Widener Law
Sch. Legal Studies Research Paper No. 09-13, Harvard Law & Econ. Discussion Paper No.
630, 2009), available at *http:// ssrn. com/ abstract= 1349971 ("Harvard ")*.

(2) failure of oversight.   In the case of the duty of loyalty, the plaintiff can prevail by showing that board action was not undertaken in a good faith effort to further the stockholders' best interests, but for some personal reason, such as entrenchment.   If the plaintiff proves subjective bad faith of that kind, it can have the challenged action set aside in equity as a breach of the duty of loyalty and potentially recover monetary damages or other relief for the injury to the corporation. *Harvard* at 18-19. The duty of loyalty is implicated because the Trustee has alleged that the Board Defendants took actions for their own personal benefit obligating Direct Response to assume the obligations of the other companies within the corporate family for the benefit of the Board Directors and to the detriment of Direct Response.   In this case Direct Response had interlocking directorates. The Direct Response board was comprised of directors who also served on the boards of Seaport, OTMH, and Innovation.   Am. Compl. ¶ 56.   Therefore those directors were on both sides of transactions by Direct Response on behalf of Innovation, Seaport, and OTMH. *Id.* at ¶¶ 56, 57, 59.   The Trustee has also alleged facts that those transfers were not made at arm's length.   *Id.* at ¶ 200-02.   Therefore, the Trustee has alleged sufficient facts which if proven would establish a claim for breach of the duty of loyalty under Delaware law.

As a subsidiary element of the duty of loyalty, a successful claim for the breach of the duty of good faith requires a plaintiff to demonstrate one of three actions: "1) where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act,

demonstrating a conscious disregard for his duties." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del.2006). Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge their fiduciary obligations in good faith. *Stone v. Ritter*, 911 A.2d 362, 370 (Del.2006).

The Trustee's claims rest upon the first and third categories,1) intentionally acting with a purpose other than that of advancing the best interests of the corporation and 2) failure to act, which describes the lack of good faith conduct that the *Caremark* Court held is "a necessary condition" for finding director oversight liability. The insider directors' actions that transferred $7.6 million from Direct Response to pay Innovation's obligations, left Direct Response with an inability to pay its own obligations. Am. Compl. ¶ 184-85.

The Trustee has alleged facts that the Board Defendants failed to assist Direct Response with its financial difficulties and reimburse costs, as the Board Defendants promised they would. *Id.* at ¶¶ 186, 163. This failure to fund Direct Response, after promising to do so, was a breach of the duty of good faith because it was an intentional act with a purpose other than advancing the best interests of the corporation, and it was an intentional failure to act in the face of a known duty to act. Both, if proven true, constitute breaches of the duty of good faith. *In re Walt Disney Co. Derivative Litig.,* 906 A.2d at 67; *See Miller v. Greystone*, 418 B.R. 533, 546 (Bankr. D. Del. 2009). Additionally, the Trustee alleges that the Defendants' actions required Direct Response to take on large amounts of debt without fair consideration or reasonably equivalent value. Am. Compl. ¶ 108-09. Finally,

on December 15, 2009, Direct Response's counsel Edwards, Angell, who also served as counsel to Seaport, OTMH, and Innovation, informed Direct Response that it could no longer serve as its counsel, indicating that the interests of the four clients were adverse. *Id.* at ¶ 204.  These additional facts, which if taken as true, form the basis of a claim for breach of the duty of good faith because they state a plausible claim that the Defendants intentionally acted with a purpose other than advancing the best interests of the corporation or failed to act where there was a known duty to act.  Therefore, the Defendants' Motions to Dismiss with respect to the post-limitations breach of fiduciary duty claims are denied.

### D.  Aiding and Abetting Claim

The Trustee asserts in the Amended Complaint that the Defendants, including Innovation, knowingly aided and abetted one another in breaches of fiduciary duty to the Debtor by encouraging, participating, and approving the Challenged Transactions, causing damage to the estate.  The Trustee bases the aiding and abetting charges on the claims that the Defendants breached fiduciary duties to the Debtor and its creditors.  In response, the Defendants argue that they did not owe or breach any duty to the Debtors.   To establish an aiding and abetting claim under Delaware law, a plaintiff must demonstrate: "(1) the existence of a fiduciary relationship; (2) a breach of a fiduciary duty; (3) knowing participation in the breach by a defendant who is not a fiduciary; and (4) damages proximately caused by the breach."  *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 370 (Del.Ch.2008) (*citing McGowan v. Ferro*, 859 A.2d 1012, 1041 (Del. Ch. 2004), *aff'd*, 873 A.2d

1099 (Del. 2005)).

Based on the Court's fiduciary duty analysis, because the Trustee has alleged sufficient facts to withstand the Defendants' Motions to Dismiss, the Court will deny the Motion to Dismiss the aiding and abetting claims (Count XI) as to all of the Defendants.

### E. Fraudulent Conveyance Claims

The Trustee complains that the Defendants are guilty of fraudulent and preferential transfers involving the obligations incurred and payments made on Innovation's behalf that were without benefit to the Debtor.  The Trustee advances two theories for relief, actual and constructive fraud and Bankruptcy Code Sections 544 and 548.

### 1. Actual Fraud

The Trustee claims that under Code Sections 544 and 548 and Delaware law[17] the Challenged Transactions constitute actual fraudulent transfers.  The transfers in question are the Debtor's incurrence of obligations on behalf of Innovation and making payments to CapSource in satisfaction of Innovation's obligations under the Amended CapSource Loan.

A plaintiff charging a violation under Section 548(a)(1) must prove that the transferor made the transfer with the "actual intent to hinder, delay or defraud creditors." *In re Pinto Trucking Serv., Inc.*, 93 B.R. 379, 386 (Bankr.E.D.Pa. 1988). In determining "intent," courts look for "badges of fraud," which include:

---

[17]  Delaware law, 6 Del. C. § 1304(b)(1), contains the same standard for fraudulent transfer as the Code, namely, the "actual intent to hinder, delay or defraud." The Court will therefore consider the applicable Bankruptcy Code provisions as incorporating Delaware law.

(I) the relationship between the debtor and the transferee; (ii) consideration for the conveyance; (iii) insolvency or indebtedness of the debtors; (iv) how much of the debtor's estate was transferred; (v) reservation of benefits; control or dominion by the debtor over the property transferred; and (vi) secrecy or concealment of the transaction.

*In re Hechinger Inv. Co., of Del.*, 327 B.R. 537, 551 (D.Del. 2005), *aff'd on other grounds*, 278 Fed.Appx. 125 (3d Cir. 2008).

The Trustee has pled sufficient facts to satisfy *Iqbal's* plausibility standard to survive a motion to dismiss the actual fraud counts.  There are sufficient facts to support a claim that the Defendants were insiders or at a minimum non-statutory insiders because of the interlocking directorates between Seaport, OTMH, Innovation and the Debtor, as well as the cross-pollinated ownership and organizational structure of the companies.  Am. Compl. ¶¶ 51, 56-60, 69, 77-83.  Similarly, there are no facts to suggest that the Debtor received any consideration from the Defendants for incurring the obligation and then later, making payments on the Amended CapSource Loan on Innovation's behalf.  The incurrence of obligations on Innovation's behalf and the subsequent payment of those obligations, made the Debtor insolvent, or pushed it deeper into insolvency.   As previously stated the interlocking directorates between Seaport, OTMH, Innovation and the Debtor, as well as the cross-pollinated ownership and organizational structure, allowed Innovation to control the Debtor and its property.   Finally, as alleged, the Challenged Transactions were accomplished with the Debtor's knowledge, but with Debtor lacking the power to stop them.  Therefore, the Trustee has satisfied the *Iqbal* standard with regard to the actual fraud counts of the Amended Complaint as to Defendants Innovation, OTMH, Lastoria and Grae.

41

The Trustee has alleged sufficient facts to demonstrate that they benefitted from the transfers.  OTMH was a guarantor of the loan and didn't have to pay CapSource as a result of Direct  Response's payment.   Innovation's obligation was paid on its behalf, and Lastoria and Grae received part of the proceeds of the Amended CapSource Loan and the Challenged Transactions.

With respect to Defendants Seaport, Stewart, Collis, Tamashunas and Meyers the Court holds that Counts I-V and VII of the Amended Complaint must be dismissed because those defendants were not initial transferees or entities for whose benefit the transfer was made.  Under the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act, the Trustee may only recover the value of an avoidable transfer from the initial transferee of such transfer, or an entity for whose benefit the transfer was made.  11 U.S.C. § 550(a); *see also* 6 Del. C. § 1308(b).   The Trustee has not established that  Defendants Seaport, Stewart, Collis, Tamashunas and Meyers  were initial transferees, or an entity for whose benefit the transfer was made.  Therefore, Counts I-V and VII of the Amended Complaint are dismissed as to those Defendants.

## 2. *Constructive Fraud*

To survive the Motions to Dismiss on the Trustee's claim pursuant to Code Section 548(a)(1)(B), the Trustee must allege facts demonstrating that the Debtor, "received less than a reasonably equivalent value in exchange for such transfer or obligation, and was insolvent on the date that such transfer was made or such obligation incurred, or became insolvent as a result of such transfer or obligation." 11 U.S.C. § 548.  Section 548(a)(1)(B)

requires proof that the transfers incidental to the Challenged Transactions resulted in no value for the Debtor or the value received was not "reasonably equivalent" to the relinquished property. *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 210 (3d Cir. 2006). To determine "whether a debtor received reasonably equivalent value, a court looks to the totality of the circumstances of the transfer, including the following factors: (I) the fair market value of the benefit received as a result of the transfer, (ii) the existence of an arm's length relationship between the debtor and the transferee, and (iii) the transferee's good faith." *Id.* This Court has noted that although reasonably equivalent value is not defined in the Code, "a party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave." *In re Fedders North America, Inc. v. Goldman Sachs Credit Partners L.P., et al.,* 405 B.R. 527, 527 (Bankr. D. Del. 2009). Additionally, the Trustee must allege sufficient facts to establish insolvency.

### 3. *Reasonably Equivalent Value*

The Trustee has alleged sufficient facts to demonstrate that the Debtor did not receive reasonably equivalent value from the other Defendants from the Challenged Transactions. As a result of the first CapSource Loan, the Debtor was left with no unencumbered assets. Am. Compl. ¶¶ 230-34, 253. The Debtor served as a co-guarantor for a third party and received no consideration in return for encumbering its assets. Am. Compl. ¶ 98-102. Debtor did not receive any shares of OTMH, Innovation, or Seaport in consideration for co-guaranteeing the loan. Am. Compl. ¶ 106. Furthermore, in the Amended Complaint, the Trustee notes that OTMH and the Debtor's books reveal that as

of January 31, 2009, the Debtor had repaid its entire share of the Amended CapSource Loan which was $7.5 million plus interest.  Am. Compl. ¶ 139.  Notwithstanding this fact, as of January 1, 2009, when Innovation was no longer able to pay its bills when they became due, the Debtor stepped in and paid over $7.6 million of Innovation's obligations to third parties.  Am. Compl. ¶ 134.  In December 2009, the Debtor needed partial reimbursement of the $7.6 million from the OTMH, Seaport, and Innovation Defendants to pay its bills as they became due.  None of the Defendants provided the Debtor with any cash to meet its obligations.  Am. Compl. ¶ 185-86.  Based on these facts, the Court finds that the Trustee has satisfied the pleading requirements to show that the Debtor did not receive reasonably equivalent value.

### 4. *Insolvency*

Defendants argue that the Trustee failed to allege sufficient facts to establish a claim for insolvency, which is an essential element of avoidance claims.  The Amended Complaint states the following facts which, taken as true, support a finding of insolvency:

- As of November 2009, Direct Response was unable to pay its obligations as they became due.  Am. Compl. ¶ 178.
- On December 14, 2009, CapSource froze Direct Response's bank accounts based on covenant defaults that occurred on September 30, 2009.  Am. Compl. ¶ 194.
- In December 2009, Direct Response informed the Defendants that Direct Response was running out of cash and in order to pay its bills it would need approximately $2 million as a partial repayment of the $7.6 million or a short term loan from CapSource.  Am. Compl. ¶ 183, 185-187.
- The Challenged Transactions left the Debtor with an unreasonably small amount of capital to conduct business.  Am. Compl. ¶ 276.
- The Debtor's liabilities exceeded its assets by September 2006.  Am. Compl. ¶ 11.

The Trustee's factual allegations, taken as true, provide enough detail of insolvency upon

which to base the avoidance claims.

Just as with the actual fraud claims, the constructive fraud claims are subject to the § 550 statutory requirement that the defendant was an initial transferee of the transfer, or the entity for whose benefit the transfer was made. The Trustee has satisfied the *Iqbal* standard with regard to the constructive fraud counts of the Amended Complaint as to Defendants Innovation, OTMH, Lastoria and Grae.

With respect to Defendants Seaport, Stewart, Collis, Tamashunas and Meyers the Court holds that Counts I-V and VII of the Amended Complaint must be dismissed because those defendants were not initial transferees or entities for whose benefit the transfer was made. Under the Bankruptcy Code and the Delaware Uniform Fraudulent Transfer Act, the Trustee may only recover the value of an avoidable transfer from the initial transferee of such transfer, or an entity for whose benefit the transfer was made. 11 U.S.C. § 550(a); *see also* 6 Del. C. § 1308(b). The Trustee has not established that Defendants Seaport, Stewart, Collis, Tamashunas and Meyers were initial transferees, or an entity for whose benefit the transfer was made. Therefore, Counts I-V and VII of the Amended Complaint are dismissed as to those Defendants.

### F. Preferential Transfer Claims

The Court denies dismissal on the Preferential Transfer Counts VI-VII as to Defendants Innovation, OTMH, Lastoria and Grae on the grounds set forth above in the reasonably equivalent value and insolvency discussion. As to Defendants Seaport, Stewart, Collis, Tamashunas and Meyers the Court dismisses the preferential transfer

claims.

## G. Accounting Claim

Because the Court denies dismissal on the Section 548 and 544 causes of action above, it also denies dismissal of the Accounting claim, Count IX as to Defendant Innovation.

## H. Unjust Enrichment

The claim of unjust enrichment requires a showing that: I) Defendants were benefitted; ii) at the expense of the Committee's constituency; and iii) circumstances exist showing that Defendants' retention of benefits is unconscionable or equity and good conscience require restitution. *See Schock v. Nash*, 732 A.2d 217, 232 (Del.1999); *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 2010 WL 2605842 at *10 (S.D.N.Y.).

The facts contained in the Amended Complaint and previously discussed in detail establish that the Trustee has alleged sufficient facts to deny all of the Defendants' Motions to Dismiss as to the unjust enrichment claim, Count XV.

## I. Negligence

The Trustee has asserted claims of negligence against defendants OTHM, Collis, Tamashunas, Meyers, Eden and Lastoria. Am. Compl. ¶¶381-389. The Trustee's negligence claims are based on the same facts and asserted against the same defendants as its breach of the duty of care claim. As a result, this count is unnecessary and redundant and is dismissed. To the extent facts give rise to a breach of the duty of care, the claim can be litigated through the fiduciary duty count.

46

**J.  Corporate Waste & Mismanagement**

The Trustee has asserted claims of corporate waste and mismanagement against defendants Collis and Tamashunas.  Am. Compl. ¶ 390-92. As with the breach of fiduciary duty claims, Delaware has a three-year statute of limitations on corporate waste and mismanagement claims.  *In re The Brown Schools*, 368 B.R. 394, 408 (Bankr. D. Del. 2007)(*citing* 10 Del. C. § 8106).   Therefore, any claims based on corporate waste or mismanagement, must be brought within the three year statutory period, i.e., between the date the original complaint was filed March 31, 2010, and March 31, 2007.  Therefore, the Court will dismiss any corporate waste and mismanagement claims that are based on alleged actions or decisions the defendants made prior to March 31, 2007.  This will preclude any claims based on the original February 26, 2006, CapSource loan, or the September 29, 2006, Amended CapSource Loan.

There are two ways for a corporate waste claim to survive a motion to dismiss: (1) the complaint alleges facts showing that Direct Response received no consideration, or (2) the complaint alleges that a transfer of corporate assets served no corporate purpose.  *See Official Committee of Unsecured Creditors of Integrated Health Services, Inc. v. Elkins*, 2004 WL 1949290, at *17 (Del. Ch. Aug. 24, 2004).  The Amended Complaint states sufficient facts to deny the Defendants' motions to dismiss as to this claim.  The Trustee alleges that although Innovation was experiencing financial difficulties, the Defendants made the Big Picture Acquisition using Direct Response's monies by modifying the Amended CapSource Loan.  Am. Compl. ¶ 126.  The Amended Complaint further alleges that Direct Response received

no consideration for the purchase of Big Picture. *Id.* at ¶ 130.    The Amended Complaint

alleges that Direct Response paid $7.6 million on behalf of Innovation's obligations in 2009

but received no benefit, compensation, or reimbursement in return for those payments.

Am. Compl. ¶¶140,145, 158, 177-80, 202.  Therefore, the Trustee has pled sufficient facts to

deny dismissal of these claims.

## K. Conversion

The Trustee has voluntarily dismissed Count XIV for Conversion against the

defendants.

## L.  *In Pari Delicto*

The Court will deny dismissal based on the *in pari delicto* doctrine.  This Court has

previously held that the *in pari delicto* doctrine is inapplicable when the action is brought

against insiders of a debtor[18], as in the present case.  *The Brown Schools II*, 386 B.R. 37, 55-56

(Bankr. D. Del. 2008) (citing *In re Oakwood Homes Corp.*, 340 B.R. 510, 536 (Bankr. D. Del.

2006)); *See also Kaliner v. MDC Systems Corp.*, LLC 2011 WL 203872 *5 (doctrine inapplicable

to actions brought under Section 548).

## M.  Lack Of Subject Matter Jurisdiction

The Defendants argue that the adversary proceeding must be dismissed because this

---

[18]   The Bankruptcy Code defines insiders as directors or officers of the debtor
corporation; a person in control of the debtor; a partnership in which the debtor is a general
partner; a general partner of the debtor; or a relative of a general partner, director, officer,
or person in control of the Debtor. 11 U.S.C. §101(31)(B).   Defendants Lastoria,
Grae/Sickenius, Eden, Collis, Meyers and Tamashunas were directors and officers of the
Debtor, and defendants Seaport, OTMH and Innovation were persons in control of the
Debtor through the interlocking directorates.

Court lacks subject matter jurisdiction. The Defendants assert that the Debtor waived, for adequate consideration, a right to bring a bankruptcy claim arising out of the CapSource Loan Agreement. In the CapSource Loan Agreement, each party, including the Debtor, expressly and voluntarily, waived the filing of a claim with a bankruptcy court, therein creating a covenant not to sue. They contend that the covenant not to sue divests the Court of jurisdiction over the claim.

The Court does not accept the Defendants' argument. First, the Trustee's Amended Complaint is brought on behalf of the Estate's unsecured creditors which were not a party named or anticipated when the parties signed the CapSource Loan Agreement. Moreover, because of the interlocking directorates of Direct Response, there was no independent board that authorized the terms of the CapSource Loan Agreement that purports to divest this Court of subject matter jurisdiction. Also, the claim that the CapSource Loan Agreement's clause barring suit on the merits of the loan was made at arms-length, and for adequate consideration, is unsubstantiated. Savings clauses that attempt to contract around core provisions of the Bankruptcy Code are invalid. *See e.g. In re SemCrude, L.P.*, 399 B.R. 388, 389 (Bankr. D. Del. 2009) (noting that it is impermissible to allow parties to contract around the mutuality requirement of § 553); *Glenn v. Sutton (In re Sutton)*, 324 B.R. 624, 627 (Bankr. W.D. Ky. 2005) ("[D]espite the Creditor's attempt to contract around the jurisdiction of the Bankruptcy Court, this Court has jurisdiction over the dischargeability of the debt owed to the Creditor by the Debtor."). As a result, the parties attempt to waive filing a claim with this Court, purporting to create a covenant not to sue, is unenforceable

and the Court will deny Defendants' Motions to Dismiss the Amended Complaint for lack of subject matter jurisdiction.

## N.  Abstention

Defendants Eden, Lastoria, and Grae/Sickenius have argued that permissive abstention is appropriate in this case.  Permissive abstention arises under 28 U.S.C. § 1334(c)(1) which provides that "nothing in this section prevents a district court in the interest of justice, or in the interest of comity with state courts or respect for state law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."  This form of abstention occurs, therefore, when a court determines that although mandatory abstention is not applicable and that jurisdiction in the federal court was properly conferred, abstention is, in its discretion, appropriate. However, "abstention is [only] appropriate in a few carefully defined situations.... [It] remains 'the exception, not the rule ...'. [It] is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.... Therefore, 'abstention rarely should be invoked.'" *Gwynedd Properties, Inc. v. Lower Gwynedd Twp.*, 970 F.2d 1195, 1199 (3d Cir.1992)(*quoting Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); *Ankenbrandt v. Richards*, 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992))(internal quotation marks omitted).

Matters for which permissive abstention is reserved include: (1) matters in which difficult, uncertain issues of state law or those in which the state has a unique interest are presented, *In re Stephen Smith Home for the Aged, Inc.*, 80 B.R. 678, 682-87 (E.D.Pa.1987); (2)

matters in which the proceeding has been removed from state court and/or there is a parallel state court action pending, *In re Tidwell In-dustries, Inc.*, 87 B.R. 345, 348-50 (Bankr.E.D.Pa.1988); (3) the proceedings principally involve claims asserted by or against non-debtors, *In re Futura Industries, Inc.*, 69 B.R. 831, 835-36 (Bankr.E.D.Pa.1987); and (4) matters in which some other truly extraordinary aspect is present.

Because there is such "a 'narrow sphere' of cases in which discretionary abstention should be granted under § 1334(c)(1)," this jurisdiction has set out a multi-factor test for determining which cases are appropriate for the doctrine.  Courts must consider: (1) the effect or lack thereof on the efficient administration of the estate; (2) the extent to which state law issues predominate over bankruptcy issues; (3) the difficulty or unsettled nature of applicable state law; (4) the presence of a related proceeding commenced in state court or other non-bankruptcy court; (5) the jurisdictional basis, if any, other than section 1334; (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; (7) the substance rather than the form of an asserted "core" proceeding; (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court; (9) the burden of the court's docket; (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; (11) the existence of a right to a jury trial; and (12) the presence of "non-debtor parties." *In re LaRoche Industries, Inc.*, 312 B.R. 249 (Bankr.D.Del.2004)(*citing Republic Reader's Service, Inc.*, 81 B.R. 422, 429 (Bankr.S.D.Tex.1987); see also *In re Integrated Health*, 291 B.R. at 619; *Valley Media, Inc. v.*

51

*Toys R Us, Inc.* (*In re Valley Media, Inc.*), 289 B.R. 27, 29 (Bankr.D.Del.2003); *In re Continental Airlines, Inc.*, 156 B.R. 441, 443 (Bankr.D.Del.1993); *TTS, Inc. v. Stackfleth* (*In re Total Technical Services, Inc.*), 142 B.R. 96, 100-01 (Bankr.D.Del.1992).

This Court will exercise its discretion and deny the Defendants' request for permissive abstention. The Trustee's claims do not involve difficult issues of state law to which this Court is unaccustomed. Moreover, no matters have been removed to state court and there is no parallel state court action. Finally this is not a case with particularly novel legal issues. This Court addresses fraudulent transfer and preference claims that arise under the Bankruptcy Code and state law on a regular basis. In conjunction with these determinations and in the context of adversary proceedings, the Court also frequently determines breaches of fiduciary duty and aiding and abetting claims under Delaware law. The issues in this case are not encompassed in the "narrow sphere" of cases where discretionary abstention should be granted under § 1334(c)(1).

Moreover, addressing the specific factors set forth in *In re LaRoche Industries, Inc.*, state law issues do not predominate over the bankruptcy issues; Delaware state law on breaches of fiduciary duties is well settled law; there is no parallel state court proceeding; there is no other jurisdictional basis other than § 1334 for a state court to hear these claims; the claims at issue are core proceedings; any judgment rendered by the bankruptcy court would be enforced in any state court and there would be no further burden on this Court's docket. On average, these factors favor this Court retaining jurisdiction and not exercising its discretion to engage in permissive abstention of the issues before it. Therefore,

Defendants Eden, Lastoria and Grae/Sickenius' requests for permissive abstention are denied.

## O.  Trustee's Counts Against CapSource

The Trustee has asserted claims against CapSource including Preference, Fraudulent Transfer, Turnover, Accounting, Disallowance of Claims under § 502(D), equitable subordination, and unjust enrichment/constructive trust.  The Court will dismiss all of the claims against CapSource and will grant CapSource's Motion to Dismiss.

### 1. Fraudulent Conveyances Counts XVI, XVII, XVIII

To assert a claim for a constructive fraudulent transfer, the Trustee must allege facts supporting (I) that the debtor did not receive reasonably equivalent value and (ii) the debtor's insolvency. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996).  The Trustee has conceded that the Debtor received value from CapSource in exchange for the transfers that occurred following CapSource's and the lenders' extension of the financial accommodations and the funding of the loans to the Debtor and Innovation.  Am. Compl. ¶¶ 4, 11, 128.  "Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied." 11 U.S.C. § 548(d)(2)(A); *see also* 6 Del. C. § 1303(a).

The Trustee admits that the Debtor and Innovation were co-borrowers with OTMH as a guarantor, on the Amended CapSource Loan and that the Debtor was jointly and

severally obligated on that indebtedness. *Id.* at ¶ 92. The Trustee admits that each payment received by CapSource was applied by CapSource to reduce the Debtor's and Innovation's joint obligations under the Amended CapSource Loan. *Id.* at ¶ 241-42. The Trustee also admits that events of default existed under the Amended CapSource Loan. *Id.* at ¶ 171. The Debtor was contractually obligated by the Amended CapSource Loan to make payments to CapSource and the Debtor received value that was actually equivalent in the reduction of the Debtor's outstanding debt owed to CapSource.

A transfer made in satisfaction of an antecedent debt or for an obligation for which the debtor was liable presumptively constitutes reasonably equivalent value. *See Image Masters*, 421 B.R. 164, 179 (Bankr. E.D. Pa. 2009); *see also Pardo v. Gonzaba, (In re APF Co.)*, 308 B.R. 183, 187 (Bankr. D. Del. 2004) (finding that the trustee could not state a 548 fraudulent transfer claim because the payment was in satisfaction of an antecedent debt); *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981) (same). The Debtor did receive reasonably equivalent value in exchange for CapSource's secured claim and lien including, (1) payment of $1,000,000 to Eden and Scottoline, which reduced the Debtor's indebtedness under the original promissory notes, (2) a reduction in interest rates as evidenced in the Credit Agreement, and (3) increased borrowing capacity as evidenced by the Amended CapSource Loan. Am. Compl. ¶ 106 n.8. The Court does not have to address insolvency since one-half of the conjunctive requirement has not been met.

### 2. Turnover (Count XIX)

The Court has dismissed the fraudulent transfer causes of action and will therefore dismiss the turnover count.

### 3. Preference (Count XX)

The Court will dismiss the Preference count based on the reasonably equivalent value discussion above.

### 4. Accounting (Count XXI)

Because the fraudulent transfer and preference causes of action have been dismissed, the Trustee's Accounting count will also be dismissed.

### 5. Disallowance of Claims (Count XXII)

The Court has dismissed the fraudulent transfer and turnover counts. Section 502(d) is only operative after the trustee has secured an order for turnover of a successfully avoided transfer. Therefore the § 502(d) disallowance of claims count is dismissed.

### 6. Equitable Subordination (Count XXIII)

The Trustee has not plead facts sufficient to plausibly show that (I) CapSource engaged in some type of inequitable conduct; (ii) the misconduct resulted in injury to the Debtor's creditors or conferred an unfair advantage on CapSource; and (iii) equitable subordination of CapSource's claim is not inconsistent with the provisions of the Bankruptcy Code. *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 68 (Bankr. D. Del. 2002) (*citing Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,* 160 F.3d 982, 986-87 (3d Cir. 1998). There are no facts to suggest CapSource engaged in any inequitable

conduct, but merely exercised its rights under the Amended CapSource Loan.  As a result, the equitable subordination count will be dismissed.

### 7. Unjust Enrichment/Constructive Trust/Equitable Liens (Count XXIV)

To prevail on a claim for unjust enrichment or imposition of a constructive trust the Trustee must allege sufficient facts to plausibly show that (I) there was an enrichment; (ii) an impoverishment; (iii) a relation between the enrichment and the impoverishment; (iv) the absence of justification; and (v) the absence of a remedy provided by law.  *Official Comm. of Unsecured Creditors of Forman Enters., Inc. v. Forman (In re Forman Enters., Inc.)*, 281 B.R. 600, 608 (Bankr. W.D. Pa. 2002) (*citing Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999)).  Similar to the equitable subordination claim, there are no facts to suggest that there was an enrichment or an impoverishment of the parties.  As acknowledged by the Trustee, the parties, including the Debtor, entered into the express written loan agreements.  CapSource exercised its rights under the Amended CapSource Loan.  CapSource's exercise of its contractual rights under the Amended CapSource loan is not an impoverishment to the Debtor or any creditor or an unjust enrichment.  Therefore, the unjust enrichment count is dismissed as is the constructive trust and equitable liens counts which are equitable remedies that presuppose a finding of unjust enrichment.

## CONCLUSION

The Court will issue an Order consistent with the foregoing discussion and rulings.

Dated:  January 12, 2012

KEVIN GROSS, U.S.B.J.